UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

JOSEPH R.,[1]

      Plaintiff,

  v.

ANDREW SAUL,

      Defendant.

Case No.  19-cv-06672-RMI

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 13, 16

Plaintiff, seeks judicial review of an administrative law judge ("ALJ") decision denying his application for disability insurance benefits under Title II of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 4 & 9), and both parties have moved for summary judgment (dkts. 13 & 16). For the reasons stated below, Plaintiff's motion for summary judgment is granted, and Defendant's motion is denied.

**LEGAL STANDARDS**

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs*., 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase

---

[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

United States District Court
Northern District of California

"substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

On October 13, 2015, Plaintiff filed an application for child's insurance benefits, initially alleging an onset date of January 1, 1999, but later amending the onset date to October 1, 2015. *See* Administrative Record "*AR*" at 15, 17.[2] As set forth in detail below, the ALJ found Plaintiff not disabled and denied the application on October 22, 2018. *Id*. at 15-27. The Appeals Council denied Plaintiff's request for review on August 29, 2019. *See id*. at 1-4. Thereafter, on October 17, 2019, Plaintiff sought review in this court (dkt. 1) and argued: that the ALJ improperly rejected Plaintiff's statements, as well as those of his mother; that the ALJ committed error in the course of the Step Three evaluation; and, that the ALJ erred in the evaluation of the medical opinion evidence. *See* Pl.'s Mot. (dkt. 13) at 16-24. Defendant contends that no such errors were committed, and that each of the ALJ's findings rests on a foundation of substantial evidence. *See* Def.'s Mot. (dkt. 16) at 2-11.

//

//

//

---

[2] The *AR*, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #12. *See* (dkts. 12-1 through 12-15).

United States District Court
Northern District of California

# SUMMARY OF THE RELEVANT EVIDENCE

_Medical Evidence from Treating Sources_

In addition to his physical impairments such as diabetes, hyperlipidemia, and obesity, Plaintiff has been under the care of a psychiatrist or psychologist ever since he was diagnosed with anxiety, depression, and ADHD at the age of six. *AR* at 644, 731. Between the age of seven and the time he completed high school, Plaintiff was periodically evaluated for, and occasionally placed in, an individualized or special-education program due to his speech and language impairments as well as on the basis of the emotional disturbances he has experienced. *See id.* at 240-54, 261. Plaintiff was home-schooled from 2005 to 2009 (between the ages of 9 and 14). *Id.* at 261. In 2011, when he was in the tenth grade, his speech and language impairment caused administrators to once again evaluate his eligibility for special education classes by administering a series of tests. *Id.* at 255-67. Upon administering of the Wechsler Intelligence Scale for Children – Fourth Edition ("WISC-IV"), his performance on the subtests was so wildly divergent as to render it impossible to compute a reliable full-scale IQ score. *See id.* at 261, 264 ("Due to [Plaintiff's] discrepant results between the different areas measured[,] a valid full scale IQ could not be determined . . ."). For example, in the area of verbal comprehension, Plaintiff scored in the 96th percentile of all children his age (superior range), however, in the area of processing speed, he scored in the 5th percentile (borderline range). *Id.* at 264. Consequently, his school psychologist noted that "[b]ased on [his] slow processing speed, he might benefit from extended time on tests and / or reduced assignments when appropriate . . . [and] [he] might [also] benefit from counseling to deal with his reported incidents of depression and anxiety." *Id.* at 266.

As observed by his treating psychotherapist, Richard Labelle, Psy.D., Plaintiff has always suffered from numerous issues including impulse control problems relating to unresolved anger and "explosiveness" (occasionally maturing into physical violence); anxiety and excessive worry; restlessness; muscle tension; hypervigilance; fear of dying; fear of losing control; avoidance behavior relating to social situations, crowds, new places, public speaking, and doctor's appointments; depression; anhedonia; significant appetite disturbances; insomnia; irritability; low energy; guilt; hopelessness; decreased concentration; suicidal ideations; relationship problems;

mania; racing thoughts; persistent grief; and impaired judgment. *Id*. at 643-44. In 2015, however, when his father unexpectedly passed away from a heart attack, Plaintiff's condition significantly worsened. *Id*. at 644. Less than a week after losing his father, Plaintiff told his psychotherapist that "his father was his best friend, and this was the second best friend to pass." *Id*. Since then, Plaintiff has been unable to fall asleep, in that he will "just sit in bed awake, toss[ing] and turn[ing]," while ruminating about the fact that his father, grandfather, and great grandfather all passed away from heart attacks. *Id*. In addition to the family history of cardiac illness on his father's side of the family, Plaintiff's late father and his sister were also diagnosed with bipolar disorder, and his maternal great-grandmother was institutionalized. *Id*. at 645, 689. In fact, a large number of Plaintiff's maternal and paternal relatives all have suffered from ADHD, learning problems, depression and anxiety; and, each of these conditions has also taken root in Plaintiff and his sister. *Id*. at 365.

Additionally, as noted by Dr. Labelle, Plaintiff's mental impairments combine in a manner that affects his compliance with taking his medications, as well as exacerbating his fear of attending appointments with his treatment providers. *Id*. at 644. Prior to his father's passing, Plaintiff would forget to take his medications about "twice per week on average," but the passing of his father worsened that situation. *Id*. The upshot of the interrelation between these problems is that each of Plaintiff's mental impairments, themselves, operate to worsen his other mental impairments as well as his physical impairments; as noted by Dr. Labelle, Plaintiff's type II diabetes "is poorly managed . . . [and] he rarely goes to doctors' appointments or answers e-mails or phone calls from other people. He feels [that] doctors did not help his father, so he is not adherent with recommended [treatments]." *Id*. While he has never assaulted another person, the behavioral manifestation of Plaintiff's bipolar disorder, as combined with his impulse control and anger issues, is clearly evidenced by the two documented occasions on which he has broken his right hand by punching a wall in order to vent his anger. *Id*. at 644-45. His financial and academic affairs have experienced similar levels of disarray. After the passing of his father, Plaintiff inherited a substantial sum of money, however, following what his treatment providers called a "spending spree," Plaintiff had quickly extinguished more than two-thirds of that sum. *Id*. at 680.

United States District Court
Northern District of California

United States District Court
Northern District of California

On another occasion, treatment records reflect that even something as mundane and commonplace as experiencing difficulty in finding a parking space has sent Plaintiff tumbling into a mental breakdown. *Id*. at 684. Yet another indication that his conditions combine in a manner that worsens the effect of each is evident in the fact that, sometimes, Plaintiff experiences emotional outbursts *about* whether or not he suffers from bipolar disorder in the first place. *Id*. at 686.

In April of 2017, Plaintiff reported to Bettina Karen Mutter, M.D., his treating psychiatrist, that despite taking a course-load below the minimum allowance for what would be considered a full-time student at college, Plaintiff was still failing his classes and on the verge of expulsion due to the debilitating extent of his depression which causes him to "go[] through periods that can last 3-4 weeks when he cannot get out of bed." *Id*. at 688. Another entry in Dr. Mutter's treatment notes should be noted here because it provides a window into the effect of Plaintiff's radical mood swings on his day-to-day life. *See id*. at 689. His mother reported that, during the period just before Christmas of 2016, Plaintiff experienced an alarmingly wide ranging mood swing wherein, a few days before Christmas, he was in such an exaggeratedly good mood that he stayed up all night one night and impulsively drove three hours to a lake in the middle of the night for hiking (all of which was highly unusual for him, given his ordinarily sedentary lifestyle) only to realize that the hiking trails were closed because it was the middle of the night – causing him to turn around and drive home. *Id*. Then, on Christmas day, while Plaintiff started the day in a good mood while cooking alongside his mother, when his sister went outside, Plaintiff suddenly and inexplicably became so enraged about the possibility that his dog might escape from the house that he started cursing and screaming at his sister – later punching a hole in the wall – and then sinking into a deep depression that would last upwards of two months. *Id*. Dr. Mutter characterized the midnight drive to the lake as a hypomanic episode, and changed Plaintiff's medications to also include a mood stabilizer, in addition to the plethora of other medications in his regimen. *Id*. at 690-91. Oddly, one of the pronounced side-effects of this particular mood stabilizer happened to be an increased risk of suicide, thus, Plaintiff and his mother were instructed to be vigilant in contacting a mental health provider if Plaintiff were to develop suicidal thoughts. *Id*. at 691.

In September of 2017, Dr. Mutter addressed a letter to Plaintiff's college requesting that he

be permitted to change his status to that of a part-time student due to his inability to cope with the demands of full-time academia because of his "[c]urrent medical instability requiring medication switches and trials . . ." *Id*. at 709. Thereafter, three months later, and notwithstanding the reduction in his course-load, Plaintiff was seen "crying over lunch," as a result of which his mother stated that he looked "defeated" by the fact that while "enjoying [his] classes," he was nevertheless still failing due to an inability to even tolerate the lightened course-load; and, when asked if he was complying with his medication regimen, Plaintiff kept saying, "I don't know mom, I don't know." *Id*. at 711. As time was passing – and despite the drastic reduction of his class schedule – Plaintiff's condition was clearly deteriorating as school had somehow become *more* stressful than before. *See id*. at 712. During this period, his mother visited him at college often and, despite using a pill organizer and a specialized alarm designed to remind him to take his various medications in a timely manner, she reported that it was clear to her that he was not taking his medications with any regularity as she would observe him set the alarm and leave the house before it would activate, thereby forgetting to take any medications at all. *Id*. at 717. For these reasons, Dr. Mutter recommended that the best course of action would be for Plaintiff to withdraw from college entirely, and to move back in with family so that they could at least ensure that he would take his medications in a timely manner, while also working on identifying his goals and developing some coping mechanisms. *Id*. at 718. However, given that Plaintiff was obligated under a lease with his college roommates, and given the impracticality of having his emotional support dog (a Great Dane) in his mother's home, it was decided that Plaintiff would remain in his college apartment a little longer. *Id*. As a result, Dr. Mutter authored a letter that day (December 15, 2017) to Plaintiff's academic institution, informing them of his psychiatric conditions (autism spectrum disorder, inattentive type ADHD, depressive type bipolar 2 disorder, and anxiety disorder) and stating that "[t]hese psychiatric conditions cause significant challenges to his ability to function in an academic setting and he should receive appropriate supports and accommodations to maximize his chances for success." *Id*. at 723.

Two months later, on February 14, 2018, Dr. Mutter authored another such letter, explaining that Plaintiff's mental health disorders, combined with "his depression and difficulty

with executive function[,] have impaired his ability to follow health care recommendations, resulting in [a] worsening medical status." *Id*. at 731. Dr. Mutter added that although Plaintiff "has persistently tried to attend college . . . his psychiatric issues have also impaired his ability to function in an academic setting, and would also currently impair his ability to be gainfully employed. I recommend that he move home to live with his mother, where he can receive her support and supervision and hopefully begin to receive the intensive psychiatric and medical treatment that he needs. Due to his severe psychiatric problems, he is not able to adequately care for himself at this time living on his own." *Id*. Plaintiff did not take this news well, in fact, he was so disturbed by this turn of events that his primary care physician expressed a "concern about [a] risk of death if [Plaintiff] does not take action on his health problems . . . [while noting that Plaintiff] states he is very aware of the risk, but feels he is unable to address the issues at this time because he is so stressed with having to have left school, applying for disability, [and] considering moving [back] home." *Id*. at 732. In the middle of this tempest, Plaintiff received a jury summons, in regards to which Dr. Mutter authored yet another letter, dated February 22, 2018, stating: "[p]lease excuse him from jury duty. He is currently disabled by psychiatric symptoms and not able to serve on a jury." *Id*. at 737.

Lastly, it should not go without mention that all of the treatment notes attending the entire history of Plaintiff's psychiatric care, from 2004 to 2018, are wholly consistent with Dr. Mutter's ultimate conclusion that Plaintiff's psychiatric condition precludes his ability to function either in the workplace, or in an academic setting, or even as a member of a jury. *See id*. at 294-383, 422-601, 630-737. For example, as early as 2008 (when he was only 13) the following observations were made about the state of his mental health: impaired concentration; distractible; poor impulse control, insight, and judgment; generalized anxiety symptoms; difficulty controlling his excessive worry; insomnia; slurred and impaired speech; impaired working memory; the manifestation of tic symptoms including excessive blinking and word-repetition; avoidance of eye contact; repetitive behaviors (such as repeatedly reading the same book); psychomotor agitation; as well as an abnormally low frustration tolerance, coupled with depression symptoms. *See id*. at 364-67.

//

United States District Court
Northern District of California

1

United States District Court
Northern District of California

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Consultative Psychological Examination*

In July of 2016, when Plaintiff was 21 years old, he was referred to Rita Sampaio, Ph.D., by the state disability determination agency for a consultative psychological assessment. *Id*. at 624-28. Initially, Dr. Sampaio noted that her evaluation was valid only from a psychological (as opposed to psychiatric) standpoint. *Id*. at 627. After noting that Plaintiff's "past medical history is remarkable as described above in the presenting problem," Dr. Sampaio incorrectly noted that "[t]he claimant has served in the US [m]ilitary." *Id*. at 625. It appears that this must be an errant statement because a thorough and searching review of the record in this case reveals no reference to any military service. In any event, Dr. Sampaio conducted a mini-mental state examination (which is "a brief 30-point questionnaire test that is used to screen for cognitive impairment . . . [and is] commonly used to screen for dementia."); thus, as to cognitive function, Dr. Sampaio found Plaintiff to be generally unimpaired in all domains of cognition with the exception that she opined he was only "mildly impaired" with regard to the following abilities: following complex or detailed instructions; maintaining adequate pace or persistence to perform complex tasks; maintaining adequate attention or concentration; adapting to changes in the job routine; withstanding the stress of a routine workday; interacting appropriately with others; and, adapting to changes, hazards, or stressors in the workplace. *Id*. at 627-28. In short, while Dr. Sampaio rendered diagnostic impressions including depression, anxiety disorder, and ADHD, her evaluation was expressly limited to gauging Plaintiff's level of cognitive function – and she does not appear to have either evaluated his level of emotional function, nor did she opine about the emotional aspects of his mental health. *See id*. at 624-28.

*Lay Witness Testimony*

In November of 2015, Plaintiff's mother completed and submitted a function report on his behalf. *Id*. at 175-84. At the outset, she noted her son's concentration deficits, his low stress tolerance, his panic attacks, his antisocial and obsessive tendencies, his depression (causing him to be perpetually exhausted), and his insomnia. *Id*. at 176. She then described what might be a typical day for Plaintiff as such: his insomnia keeps him up at night which, combined with his penchant for repetitive behaviors, causes him to pace back and forth throughout the night; he plays the same

video games "over and over again"; he spends much of the day sobbing; he makes himself a lunch which he eats alone; he showers only a few times a week (but only when his mother's constant prodding overpowers his resistance); and, he spends much of the rest of the day intermittently sleeping. *Id*. at 177, 178. She also noted that Plaintiff "hates the feel of hair on his head [and that he has] shaved [his] head since [was] six years old." *Id*. Further, he is unable to remember to take his medications, and simply will not take his medications unless his mother physically hands him the pills and watches him consume them. *Id*. at 178. Plaintiff's ability to prepare meals and feed himself is limited to sandwich-making and heating microwavable meals. *Id*. He is also hypersensitive to noises and smells; which is why, in his mother's opinion, he is unable to help with the yardwork. *Id*. at 179, 183. As for shopping, Plaintiff is generally limited to online shopping; and, even then, his obsessive focus limits him to purchasing survival gear, video games, books, and maps – this activity can consume countless hours because he "gets obsessed looking for 1 thing." *Id*. at 179.

As for his ability to handle money and manage funds in his own interest, Plaintiff's mother notes that if given the opportunity, he would squander all of his funds, in that "he would give money to everyone[,] the value of money isn't adding up." *Id*. Plaintiff rarely leaves home except to occasionally attempt to purchase a sandwich from Subway sandwiches, and even then, he "won't wait in line, [he] will wait [outside] until [the store] is empty or [he] leaves with nothing." *Id*. at 180. Because his depression has worsened to such a degree since his father's death, Plaintiff cannot get along with anyone – including family – or, in his mother's words, he has become a "loner – [he] doesn't want to talk [and] thinks most people are stupid." *Id*. at 181. As for authority figures such as police, bosses, landlords, or teachers, Plaintiff "thinks they are all idiots." *Id*. at 182. Consequently, he has never managed to be employed in any capacity at all. *Id*. His conditions, in his mother's estimation, interfere with his ability to remember, to complete tasks, to concentrate, to understand, to follow instructions, and to get along with others. *Id*. at 181. Since his father's passing, he has been unable to stop obsessively pacing back and forth while constantly ruminating on the fear that "everyone he loves will die." *Id*. at 182.

//

United States District Court
Northern District of California

*Hearing Testimony*

On March 15, 2018, a hearing was conducted before the ALJ. *Id*. at 34-59. The hearing began with Plaintiff recounting what he could remember of his history of special education classes, his period of home schooling, and his period of "hospital schooling." *Id*. at 37-39. Following high school, Plaintiff unsuccessfully attempted to complete college coursework, and even at a reduced load, he was simply unable to function in that environment, so he withdrew and moved back home per the advice of his treating psychiatrist. *Id*. at 39-42. Since then, the effects of Plaintiff's depression have continued to compound and he no longer engages in the very few activities he formerly enjoyed; Plaintiff testified in this regard, "I don't play video games anymore, which I used to play quite a bit. I did table top role playing games with my father, and it's very difficult [now] to enjoy that [g]ame just because [of the] memories." *Id*. at 41-42. Since 2015 (when his father passed), Plaintiff has experienced depression symptoms between 5 and 6 days a week on average. *Id*. at 42. He then described the irregular but frequent occurrences of his insomnia, as well as the regularity of his appetite disturbances, testifying that "[s]ome days I don't eat very much, but other days I eat way too much." *Id*. at 43. He added that he experiences frequent difficulties concentrating; that he frequently ruminates on feelings of hopelessness and excessive worry; and that these symptoms combine to make it difficult for him to even leave the house because, as Plaintiff put it, "I don't feel like facing the world, and when I do, sometimes I get like this and I don't want to be seen in public like this." *Id*. at 43-44. When asked to explain what he meant by saying, "I get like *this*," Plaintiff explained, "I'm crying [right now]. That's not socially acceptable for a grown man to be crying in public." *Id*. at 44-45. Pointedly, when asked about his distractibility and his trouble paying attention when he goes out or when he tries to do something, Plaintiff asked for the question to be repeated. *Id*. at 45. Once the question was repeated, Plaintiff responded to the following effect: "Yeah. My mind wanders a lot, especially when I'm, you know, thinking about either what I was doing to do before, you know, before my dad died or if I think about my dad . . . a lot of the times I forget to feed my dog even and he'll just tear things up because I haven't fed him and then I realize oh, he hasn't been fed in, you know, a day, and it's really unfortunate because, you know, my roommates have to help take care of him

10

and he's one of the things that keeps me going." *Id*. When asked to elaborate on his fear of going to a doctor's office, Plaintiff responded: "Stress mostly. Like I fear what they're going to say and I realize that's completely irrational, but, you know, I end up having an anxiety attack if I think about it too closely." *Id*. at 47.

With that, the ALJ called upon the vocational expert ("VE") to testify – in which regard, the ALJ posited the first of several hypothetical questions: the VE was asked whether there would be any employment for a person of Plaintiff's age, background, and experience who could work at all exertional levels and understand, remember, and carry out simple and some detailed routine tasks involving simple work-related decisions while being able to adapt to routine workplace changes. *Id*. at 53. The VE answered in the affirmative and opined that such a person could work as a hand packager, as a bench assembler, or even as a manager. *Id*. at 53-54. The ALJ then posited the second hypothetical question as being identical to the first except that the VE was directed to assume that the person needed to work in a low-stress environment such as to require only occasional decision-making, occasional use of judgment, occasional changes in the work setting, and no production rate or fast-paced work. *Id*. at 54. In response, the VE opined that such a person could function as a janitor, a hand packager, or a laundry worker. *Id*. at 54-55. The ALJ's third hypothetical began to venture into vague and indeterminate territory; the VE was asked to assume the facts of the second hypothetical while adding the following limitation: "the individual may be off task up to 10% of the work day, but would not consistently be off task 10% of every work day; and the individual may miss up to one day of work a month at time, but would not consistently miss one day every month . . . and the individual would need let's say one unscheduled ten minute break in addition to normal breaks during the course of the work day." *Id*. at 55. The VE responded that such a person would be unemployable. *Id*. The VE then clarified that anything more than being off-task 10% of the time, or any more than 1 day of absenteeism per month would result in the person being unemployable at the unskilled level. *Id*. at 56. Plaintiff's counsel then asked the VE whether once-a-week emotional outbursts – such as heavy crying or other inappropriate workplace behavior that might distract co-workers – would render a person unemployable; the VE answered that once-a-week crying (or other outbursts) would render

11

1   someone unemployable. *Id.* at 57. The ALJ then interjected to ask the VE whether a hypothetical

2   janitor, who might be working in isolation while crying but still continuing to perform janitorial

3   duties, would be employable. *Id.* at 57-58. The VE responded as such: "kind of like if a janitor

4   might be crying while they're still doing the work? - - - Yeah, that's - - my opinion is they could

5   still perform the job." *Id.* at 57-58. The VE then clarified that this opinion was not limited to

6   janitors, but that a person would still be employable, notwithstanding the crying, so long as they

7   were still performing the job duties of a hand packager or a laundry worker. *Id.* at 58.

8   **THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

9       A person filing a claim for social security disability benefits ("the claimant") must show

10  that he has the "inability to do any substantial gainful activity by reason of any medically

11  determinable physical or mental impairment" which has lasted or is expected to last for twelve or

12  more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[3] As required by Section 202(d) of the

13  Social Security Act, in order to be entitled to child's insurance benefits, a claimant must have a

14  disability that began before the age of 22 (*see* 20 C.F.R. 404.350(a)(5)). The ALJ must consider all

15  evidence in the claimant's case record to determine disability (*see id.* § 416.920(a)(3)), and must

16  use a five-step sequential evaluation process to determine whether the claimant is disabled (*see id.*

17  § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that

18  the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

19      Here, the ALJ set forth the applicable law under the required five-step sequential

20  evaluation process. *AR* at 15-17. At Step One, the claimant bears the burden of showing he has not

21  been engaged in "substantial gainful activity" since the alleged date on which the claimant became

22  disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be

23  substantial gainful activity, the claimant will be found not disabled. *See id.* The ALJ in this case

24  found that Plaintiff, born on July 10, 1995, had not yet attained the age of 22 as of October 1,

25  2015, the amended alleged onset date. *AR* at 17. Further, the ALJ found that he had not engaged in

26

27  ───────────────

28  [3] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II) are virtually identical though found in different sections of the CFR. For the sake of convenience, the court will generally cite to the SSI regulations herein unless it is necessary to note otherwise.

United States District Court
Northern District of California

1    substantial gainful activity since October 1, 2015. *Id*. at 17. At Step Two, the claimant bears the

2    burden of showing that he has a medically severe impairment or combination of impairments. *See*

3    20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight

4    abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the

5    ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting

6    S.S.R. No. 96–3(p) (1996)). At Step Two, the ALJ found that Plaintiff suffered from the following

7    severe impairments: affective disorders (depression and anxiety), bipolar disorder, attention deficit

8    hyperactivity disorder ("ADHD"), and autism spectrum disorder (high functioning). *AR* at 17.

9        At Step Three, the ALJ compares the claimant's impairments to the impairments listed in

10   appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the

11   burden of showing his impairments meet or equal an impairment in the listing. *Id*. If the claimant

12   is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful,

13   the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four.

14   *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that, prior to attaining the age of 22, Plaintiff

15   did not have an impairment or combination of impairments that met or medically equaled the

16   severity of any of the listed impairments. *AR* at 18-20. Next, the ALJ determined that, prior to

17   attaining the age of 22, Plaintiff retained the RFC to perform the full range of work at all

18   exertional levels subject to the following non-exertional limitations: Plaintiff is able to understand,

19   remember, and execute simple and some detailed, routine tasks, involving simple, work-related

20   decisions, and is able to adapt to routine workplace changes; Plaintiff would need to work in a low

21   stress environment that would require only occasional decision-making, occasional use of

22   judgment and occasional changes in the work setting with no production rate or fast-paced work;

23   Plaintiff can tolerate occasional contact with supervisors and coworkers, and brief cursory contact

24   with the public; and, Plaintiff may miss work up to one day per month, at times, but would not

25   consistently miss one day every month. *Id*. at 20-25. At Step Four, the ALJ determined that

26   Plaintiff is unable to perform his past relevant work because he has no past relevant work. *Id*. at

27   25. Next, at Step Five, based on the RFC as formulated, and the VE's testimony, the ALJ found

28   that, prior to attaining the age of 22, Plaintiff would have been able to perform the requirements of

13

a janitor, a laundry worker, or a hand packager. *Id*. at 25-26. Thus, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, at any time prior to July 9, 2017, the date on which he attained the age of 22. *Id*. at 26-27.

## DISCUSSION

Plaintiff contends that the ALJ incorrectly weighed the opinion evidence; incorrectly rejected the testimony of Plaintiff and his mother; and incorrectly found that Plaintiff does not meet or equal the requirements of Listing 12.04. *See* Pl.'s Mot. (dkt. 13) at 16-24. Accordingly, Plaintiff submits that the only proper remedy is to credit the improperly discredited evidence as true, while remanding for the immediate calculation and payment of benefits. *Id*. at 25. Defendant submits that the ALJ's rejection of Plaintiff's testimony was proper because: "Plaintiff has engaged in on-line gaming"; because he has inherited money in the past from his father's estate, with which he purchased an automobile; because Plaintiff has, on one or more occasion, "drank 2-8 shots on gambling nights"; and, because Plaintiff has "engaged in Marshal (sic) Art with friends." *See* Def.'s Mot. (dkt. 16) at 4 (citing *AR* at 23, 302, 586, 645-46).[4] Defendant adds that any error in failing to consider the testimony of Plaintiff's mother was harmless because Defendant contends that Plaintiff is in fact not disabled. Def.'s Mot. (dkt. 16) at 5-6. Lastly, Defendant submits that the ALJ properly discounted the opinions of Plaintiff's treating physicians (Drs. Labelle and Mutter), and that Plaintiff failed to establish a listing level of severity for any of his mental impairments. *Id*. at 6-11.

The ALJ in this case rejected the evidence offered by Plaintiff's mother in the above-described function report on the basis that her entire account is somehow inconsistent with a number of Plaintiff's daily activities, namely: playing the same games over and over again; crying after taking his medications; being forced to shower a few times a week; preparing sandwiches and microwavable food; shaving his head; "taking his dirty clothes to the garage so his mother can wash them"; going outside; going to the Subway sandwich shop; shopping online; carrying a trash

---

[4] It appears that Defendant's reference to 'martial arts' is not so much an exercise in physical combat techniques as it is a role playing game of some sort wherein, six years ago, Plaintiff and a friend played with plastic replica swords of a medieval design.

United States District Court
Northern District of California

can to and from the curb; and, "sometimes running errands with his mom while usually waiting in the car." *See AR* at 21. In order to reject the testimonial statements of a lay-witness, an ALJ must "give[] reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). The reasons advanced for rejecting lay-witness testimony must also be "specific." *Stout v. Comm'r, SSA*, 454 F.3d 1050, 1054 (9th Cir. 2006). Germane reasons for discrediting such testimony could include inconsistency with the medical evidence, or the fact that the testimony "generally repeat[s]" the properly discredited testimony of a claimant. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). The mere lack of support from medical records is not a germane reason to discount lay-witness testimony. *Diedrich v. Berryhill*, 874 F.3d 634, 640 (9th Cir. 2017). Here, the ALJ's given reasons for rejecting the statements provided by Plaintiff's mother are puzzling, to say the least, in that there does not appear to be any logical connection between the activities that the ALJ seemed to think were indicative of a higher level of function than what was espoused by his mother's account, and the statements in the third party function report. In other words, no part of the above-described account of Plaintiff's mother is in any way undermined by any of the daily activities (e.g., crying after taking medications, giving your clothes to someone else for washing, or sitting in the car while someone else runs errands) relied upon by the ALJ. Instead, if anything, the parade of Plaintiff's activities that were identified by the ALJ in support of the rejection of Plaintiff's mother's testimony only serve to buttress and bolster that testimony, rather than undermine it. Thus, because the ALJ improperly rejected this testimony, it will now be credited as true as a matter of law.

As to Plaintiff's testimony, it should first be noted that the ALJ in this case did not find that Plaintiff had engaged in any degree of malingering – as evidenced by the ALJ's statement to the effect that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." *Id*. at 22. Nevertheless, the ALJ rejected the entirety of Plaintiff's testimony (presumably for the same reasons that the ALJ rejected the testimony of Plaintiff's mother) without saying anything more than, "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *AR* at 22.

United States District Court
Northern District of California

1    However, "[w]hen an Administrative Law Judge (ALJ) determines that a claimant for Social

2    Security benefits is not malingering and has provided objective medical evidence of an underlying

3    impairment which might reasonably produce the pain or other symptoms he alleges, the ALJ may

4    reject the claimant's testimony about the severity of those symptoms only by providing specific,

5    clear, and convincing reasons for doing so." *Brown-Hunter v. Colvin*, 806 F.3d 487, 488-89 (9th

6    Cir. 2015). The Court of Appeals for the Ninth Circuit has "'repeatedly asserted that the mere fact

7    that a plaintiff has carried on certain daily activities . . . does not in any way detract from [his or]

8    her credibility as to [] overall disability.'" *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007)

9    (quoting *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001)). In this context, "[t]he ALJ must

10   make 'specific findings relating to [the daily] activities' and their transferability to a work setting

11   to conclude that a claimant's daily activities warrant an adverse credibility determination." *Id.*

12   (quoting *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)). The ALJ's explanation for

13   rejecting Plaintiff's testimony falls significantly short of this mark in that the reasoning is neither

14   specific (there is no indication as to which activity was thought to undermine which portion of

15   Plaintiff's testimony as there was no analysis or discussion in this regard at all), nor was it clear

16   (in that there is no way to glean how sitting in the car or shaving one's head or taking out the trash

17   undermines any of Plaintiff's testimony, let alone all of it), and, as explained above, reliance on

18   these daily activities in support of rejecting Plaintiff's testimony is unconvincing. Therefore,

19   because the ALJ improperly rejected Plaintiff's testimony, it will now be credited as true as a

20   matter of law.

21          As to the medical opinion evidence, the ALJ rejected Dr. Mutter's work-preclusive

22   opinions, while giving "significant weight" (albeit with very little discussion) to the opinion of Dr.

23   Sampaio, as well as the opinions of the non-examining state agency consultants, because the ALJ

24   concluded that these sources were generally consistent with one another in that they all assess that

25   the claimant is capable of performing simple as well as detailed work, handling usual stresses of

26   work, sustaining simple repetitive tasks, and associated mild to moderate "B" criteria with some

27   minor differences in the degree of specific function-by-function limitations. *AR* at 24-25.

28   However, as mentioned above, Dr. Sampaio only opined a series of mild and moderate limitations

United States District Court
Northern District of California

16

attending Plaintiff's *cognitive* functioning, not his emotional functioning. *See id.* at 624-28. As to the state agency consultants, the ALJ is not legally permitted, under these circumstances (i.e., in light of Dr. Mutter's contrary opinion, as supported by Dr. Labelle's opinions, and supported by a lifetime's worth of underlying medical records), to base the RFC and the hypotheticals addressed to the VE entirely on the opinions of non-examining consultants because it is well known that "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995); *see also Revels*, 874 F.3d at 654-55; *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67 n.2 (9th Cir. 2006); *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993). As for the other reasons that the ALJ articulated in support of rejecting Dr. Mutter's opinions, those explanations are embodied in the ALJ's single statement to the effect that Dr. Mutter's opinions "are not consistent with the entire evidence of record." *AR* at 24. However, by "the entire evidence of record," the ALJ referred only to a very small sampling of carefully assembled and curated snippets from the record, all of which were removed from their context, in an unpersuasive effort to discredit Plaintiff's treating psychiatrist.

   "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss*, 427 F.3d at 1216); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his [or her] interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). In situations where a Plaintiff's condition

United States District Court
Northern District of California

1   progressively deteriorates, the most recent medical report is the most probative. *See Young v.*

2   *Heckler*, 803 F.2d 963, 968 (9th Cir. 1986).

3        It is not necessary to determine whether or not Dr. Mutter's later-rendered findings and

4   opinions were "contradicted" by the earlier rendered opinions of the state agency consultants

5   because the ALJ's explanation for rejecting Dr. Mutter's well-founded opinions did not even rise

6   to the level of specific and legitimate reasons supported by substantial evidence because, in light

7   of the record as a whole (as described in detail above), it cannot be reasonably said that the outlier,

8   and incomplete, opinion of Dr. Sampaio (focused as it was only on cognitive function), or those of

9   the state agency consultants (as embodied by the RFC as formulated and modified by the ALJ), in

10   combination or individually, constitute "substantial evidence."  To put it another way, in light of

11   the evidentiary record, the conclusory and unsupported opinions by non-examining consultants (as

12   well as Dr. Sampaio's incomplete opinion) are incapable, in and of themselves, of being

13   characterized as "such relevant evidence as a reasonable mind might accept as adequate to support

14   a conclusion" to the effect that Plaintiff's mental health conditions are attended with so few

15   limitations as are found in the RFC described above. *See Biestek*, 139 S. Ct. at 1154.

16        In short, the ALJ's only identification of the supposed 'inconsistencies' in the record that

17   justified rejecting the opinion of Dr. Mutter, someone who had been Plaintiff's treating

18   psychiatrist for nearly his life were limited to: (1) sometimes there are indications in the record

19   that some unspecified number of Plaintiff's symptoms had briefly experienced improvement; (2)

20   that in November of 2018, Plaintiff "tried to get outside of the house one today (sic) and do some

21   walking"; (3) that at some point in time, Plaintiff once said that he "had been doing well on Prozac

22   and Wellbutrin XL"; (4) that Plaintiff once indicated in an email to his treating physician that, in

23   September of 2016, "the dog [which he would frequently forget to feed] had significantly helped

24   with mental health issues"; (5) that a February 2017 progress note indicated that Plaintiff was

25   (then) complying with his medications and thought that they were helpful; (6) that Plaintiff had at

26   some point in time declined individual psychotherapy sessions; (7) that he began using an alarm to

27   remind him to take his medications and once reported that it seemed to be working; (8) that in

28   June of 2017, Plaintiff reportedly said, "I'm doing pretty well"; (9) that he once completed an

United States District Court
Northern District of California

United States District Court
Northern District of California

1   academic quarter of school without being dismissed; and, (10) that upon *physical* examinations,

2   sometimes, nurses or other intake professionals did not note any serious psychiatric distress. *See*

3   *AR* at 24-25. The undersigned finds none of these to be legitimate reasons for rejecting any portion

4   of Dr. Mutter's opinions. Thus, because the ALJ improperly rejected the opinions of Plaintiff's

5   treating physicians, those opinions will now be credited as true as a matter of law.

6                                 **Nature of Remand**

7           The decision whether to remand for further proceedings or for payment of benefits

8   generally turns on the likely utility of further proceedings. *Carmickle v. Comm'r, SSA*, 533 F.3d

9   1155, 1169 (9th Cir. 2008). A district court may "direct an award of benefits where the record has

10  been fully developed and where further administrative proceedings would serve no useful

11  purpose." *Smolen*, 80 F.3d at 1292. The Court of Appeals for the Ninth Circuit has established a

12  three-part test "for determining when evidence should be credited and an immediate award of

13  benefits directed." *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Remand for an

14  immediate award of benefits is appropriate when: (1) the ALJ has failed to provide legally

15  sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be

16  resolved before a determination of disability can be made; and, (3) it is clear from the record that

17  the ALJ would be required to find the claimant disabled were such evidence credited. *Id*. The

18  second and third prongs of the test often merge into a single question; that is, whether the ALJ

19  would have to award benefits if the case were remanded for further proceedings. *Id*. at 1178 n.2;

20  *see also Garrison v. Colvin*, 759 F.3d 995, 1021-23 (9th Cir. 2014) (when all three conditions of

21  the credit-as-true rule are satisfied, and a careful review of the record discloses no reason to

22  seriously doubt that a claimant is, in fact, disabled, a remand for a calculation and award of

23  benefits is required). Here, in light of the above-discussed and improperly discredited lay-witness

24  account, as well as Plaintiff's own testimony, and the medical opinion evidence, two things are

25  clear: first, it is clear that Plaintiff has in fact been disabled since *at least* his alleged onset date,

26  and second, it is clear that further administrative proceedings would serve no useful purpose

27  because the ALJ would be required to find Plaintiff disabled for a number of reasons on remand.

28          Plaintiff's depressive disorder, his anxiety disorder, and his bipolar disorder – each –

                                        19

1   would undoubtedly compel independent disability findings at Step Three because they each clearly

2   meet or equal the criteria for the three relevant listings. However, for present purposes, it is only

3   necessary to undertake the Step Three analysis for two such disorders; to wit: under Listing

4   12.04(A)(1) (depressive disorder), and 12.04(A)(2) (bipolar disorder). *See* 20 C.F.R. Pt. 404,

5   Subpt. P, app. 1, § 12.04. Therefore, the first reason that further administrative proceedings would

6   be useless is that based on the improperly discredited evidence, Plaintiff's depression clearly

7   meets the criteria of Listing 12.04(A)(1). In order to satisfy the pertinent criteria of Listing 12.04

8   regarding either depression or bipolar disorder, it is necessary to satisfy the requisite number of

9   criteria listed in Subpart (A) and (B), or (A) and (C). *See id*. For depression, Subpart (A)(1)

10   requires medical documentation of a depressive disorder, characterized by five or more of the

11   following: depressed mood; diminished interest in almost all activities; appetite disturbance with

12   change in weight; sleep disturbance; observable psychomotor agitation or retardation; decreased

13   energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; or thoughts of

14   death or suicide. § 12.04(A)(1). As discussed above, his treating physicians have essentially found

15   that Plaintiff meets <u>*all*</u> of the Subpart A(1) criteria for depression. *See AR* at 643-44 (Dr. Labelle

16   found that Plaintiff suffered from: impulse control problems relating to unresolved anger and

17   "explosiveness" (occasionally maturing into physical violence); anxiety and excessive worry;

18   restlessness; muscle tension; hypervigilance; fear of dying; fear of losing control; avoidance

19   behavior in social situations, crowds, new places, public speaking, and doctor's appointments;

20   depressed mood; anhedonia; significant appetite disturbances; insomnia; irritability; low energy;

21   guilt; hopelessness; decreased concentration; suicidal ideations; relationship problems; mania;

22   racing thoughts; persistent grief; and impaired judgment); *see also id*. at 364-67 (Dr. Mutter found

23   that Plaintiff experiences impaired concentration; distractibility; poor impulse control, insight, and

24   judgment; generalized anxiety symptoms; difficulty controlling his excessive worry; insomnia;

25   slurred and impaired speech; impaired working memory; the manifestation of tic symptoms

26   including excessive blinking and word-repetition; avoidance of eye contact; repetitive behaviors

27   (such as repeatedly reading the same book); psychomotor agitation; an abnormally low frustration

28   tolerance; in addition to a number of other depression symptoms). Furthermore, as discussed in

United States District Court
Northern District of California

20

1   greater detail above, the evidence of record also reflects that Plaintiff meets at least five (if not six)

2   of the Subpart (A)(2) criteria relating to his bipolar disorder, where it is only necessary to satisfy

3   three of the criteria. In this regard, Plaintiff's condition causes him to suffer a decreased need for

4   sleep, increased psychomotor agitation, and distractibility (*see id*. at 643-44, Dr. Labelle; and,

5   364-67, Dr. Mutter); as well as inflated self-esteem (*see id*. 181-82, third party function report in

6   which Plaintiff's mother explains that Plaintiff sees all authority figures as "idiots," while thinking

7   that "most people are stupid"); and, lastly, involvement in activities that have a high probability of

8   painful consequences that are not recognized (*see id*. at 644-45, Dr. Mutter described two

9   documented occasions that Plaintiff has broken his hand by punching a wall in order to vent his

10  anger); *see also id*. at 680 (Plaintiff spent the bulk of his inheritance in a shopping spree focused

11  on survival gear); *see also id*. at 179 (third party function report in which Plaintiff's mother

12  explains that Plaintiff has no concept of the value of money and that he would squander any sums

13  at his disposal).

14      Additionally, when the improperly discredited evidence is given effect, Plaintiff meets the

15  dual requirements of Subpart (C) as to both depression and bipolar disorder in that Drs. Mutter and

16  Labelle noted that Plaintiff's conditions combine to collectively worsen the effects of each

17  individual condition. First, Plaintiff's conditions occasionally responding positively to Dr.

18  Mutter's efforts to periodically tinker with and adjust the medication regimen, and the conditions

19  also respond positively to the highly structured environment of his mother's home (to which Dr.

20  Mutter's orders have relegated Plaintiff, as discussed above). *See id*. at 732. Second, it was

21  *because* of his lack of a capacity to adapt to changes in his environment that Dr. Mutter opined

22  that Plaintiff was unable to attend school at all, or function in the workplace to any degree, or to

23  even serve on a jury, that she directed him to surrender any pretense to independence and to return

24  to his mother's home where could receive the proper care and assistance which he needed. *See id*.

25  at 732, 737. Accordingly, Plaintiff's depressive disorder and bipolar disorder are both disabling at

26  Step Three.

27      For these same reasons, once this improperly rejected evidence is given effect, the ALJ

28  would also be required to find that Plaintiff has no residual capacity to function in the workplace

United States District Court
Northern District of California

21

1    at all. Moreover, the VE testified that if someone were off-task more than 10% of the time, or if

2    they were required to miss work more than one day per month due to absenteeism, that such a

3    person would be unemployable. Giving full effect to the combination of testimony and evidence

4    proffered by Drs. Mutter and Labelle, as well as by Plaintiff and his mother – on remand, the ALJ

5    would also be required to find Plaintiff disabled at Step Five based on the testimony of the VE

6    because Plaintiff would be off-task or absent nearly all of the time.

7            At this juncture, the court will note that in cases where each of the credit-as-true factors is

8    met, it is generally only in "rare instances" where a review of the record as a whole gives rise to a

9    "serious doubt as to whether the claimant is actually disabled." *Revels*, 874 F.3d at 668 n.8 (citing

10   *Garrison*, 759 F.3d at 1021). This is certainly not one of those "rare instances," as the evidentiary

11   record leaves no room for any doubt that Plaintiff has in fact been disabled, at least since his

12   alleged onset date, if not much earlier. Needlessly remanding a disability claim for further

13   unnecessary proceedings would only delay much needed income for claimants such as Plaintiff

14   who are unable to work and who are entitled to benefits; doing so would in turn subject them to

15   "tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on

16   remand." *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1398 (9th Cir. 1988). The

17   court is satisfied that the ALJ's unsupported conclusions were thoroughly negated by the

18   overwhelming weight of the record evidence which conclusively and convincingly establishes

19   Plaintiff's disability such that no further inquiry is necessary.

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

Accordingly, for the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 13) is **GRANTED**, and Defendant's Cross-Motion (dkt. 16) is **DENIED**. The ALJ's finding of non-disability is **REVERSED**, and the case is **REMANDED** for the immediate calculation and payment of appropriate benefits.

**IT IS SO ORDERED.**

Dated: March 22, 2021

_____
ROBERT M. ILLMAN
United States Magistrate Judge